# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **REBECCA A. FAITH,** | : | **CIVIL ACTION NO. 3:18-CV-916** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **NANCY A. BERRYHILL, Deputy** | : | |
| **Commissioner for Social Security** | : | |
| **Operations,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

### I.  Procedural Background.

We consider here the appeal of Plaintiff Rebecca Anne Faith from an adverse decision of the Social Security Administration ("Agency") on her application for social security disability benefits ("DIB") and supplemental security income ("SSI"). Plaintiff's claims were initially denied at the administrative level on June 26, 2015. (R. 82-85). Plaintiff then requested and received a hearing before an administrative law judge ("ALJ"). Her hearing was conducted in Harrisburg on February 8, 2017. On June 19, 2017 ALJ Scott M. Staller issued an unfavorable Notice of Decision. (R. at 14-31). Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on April 11, 2018. The denial by the Appeals Council constitutes a final action of the Agency and vests this Court with jurisdiction pursuant to 42 U.S.C. § 405 (g).

## II.    Testimony before the ALJ.

Plaintiff testified at the hearing. Also testifying were Susan Judy, who lives with Plaintiff, and Andrew Caparelli, a vocational expert. ("VE"). The testimony of the claimant and witnesses may be summarized as follows.

### A.    Testimony of Rebecca Anne Faith.

Plaintiff Faith has a driver's license and drove to the hearing with her fiancé. She was born in 1993 and was twenty-three years of age on the date of the hearing. She completed high school. (R. at 37).

Plaintiff has a problem with mood swings and depression. She relates these problems to an accident she witnessed that claimed the life of her grandfather. On many days she lacks the motivation to do anything and experiences episodes of crying. She also suffers from post traumatic stress disorder ("PTSD") as a result of an abusive upbringing. She experiences flashbacks to incidents of abuse and these deepen her depression. (R. at 38).

Plaintiff has trouble getting along with other people including neighbors, family members, and friends. She is sensitive to any criticism and experiences episodes of uncontrollable anger. Criticism can upset her to the point that she experiences a blackout. At times she becomes physically aggressive and needs to be physically restrained. She refuses to be around anyone with whom she has had problems in the past. (R. 38-39).

Plaintiff has lost interest in activities she formerly enjoyed such as going for walks or writing. She formerly had a problem with alcohol but has not had a drink in two years. She does not take illegal drugs. She has tried to kill herself in the past

but has no current suicidal ideation. She has heard voices in the past. These voices suggested that she kill herself or hurt other people. (R. 40-41).

She lives with her fiancé, his two sisters, her future mother in law, and her infant son. She cooks once a week. She can dress herself although on some days she cannot bring herself to get dressed. She can bathe herself but typically showers only once a week. When her mood is low she will stay in the same clothes for up to three days. She occasionally helps with house cleaning chores and sometimes goes grocery shopping with her future mother in law. These shopping trips last from one half hour to one hour. She is able to walk around the grocery store for as long as the shopping excursion takes. (R. 41-42).

Plaintiff has two friends. She does not visit them but they do come to her home. She has no hobbies and does not go to the movies. Her sleep is erratic and somewhat dependent on her baby's schedule. At times she can sleep well, but more usually she tosses and turns and gets little sleep at night. (R. 42-43).

Plaintiff takes her medications regularly as prescribed. They include: Zoloft, 100 milligrams; Depakote, 500 milligrams; and Seroquel, 100 milligrams. The medications relieve her symptoms "for the most part" but also make her feel very tired. Her medications are not particularly effective in helping her control her anger. She also experiences uncontrolled shaking of her left arm. She attributes these tremors to anxiety. (R. 44).

In late 2014 and early 2015, she worked briefly at two jobs. The first job was as a "picker/packer" in a warehouse. She tried this job on a part time basis. When she could not perform at the company's preferred rate, she was terminated. The

second job was a production job in a food packaging plant. She lost that job due to missing too many shifts as a result of her depression. (R. 44-45).

Plaintiff experiences panic attacks a couple of times each week. These attacks, which last from five to twenty minutes, cause her to feel like the walls are closing in and impair her breathing. Recently, while experiencing a fit of uncontrollable anger, she banged her head into a door and cut herself. At times her anger provokes her to hit walls and doors. She has one of these anger episodes approximately once a week. (R. 46-47).

Plaintiff's focus and concentration is not very good. She was diagnosed with attention deficit disorder ("ADD") and was placed in a special education setting as a result. She has trouble remembering to do things and requires frequent reminders. Her fatigue is so severe that she takes naps throughout the day. She is able to do so because her friend comes to her home to watch her baby while she naps. Her naps usually last two to three hours. (R. 48).

**B. Testimony of Susan Judy.**

Susan Judy is Plaintiff's future mother in law. She has known Plaintiff for six years and has lived with her all of that time in the same home. She has personally seen Plaintiff blackout. When Plaintiff has a blackout she has no recollection of it afterward. She has also seen Plaintiff bang her head off walls and doors during fits of anger. It seems that these anger episodes are triggered by even slight criticism or the suggestion that Plaintiff is doing something incorrectly. These episodes can last from twenty minutes to two hours. They occur weekly. (R. 49-51).

About two weeks prior to the hearing, Plaintiff had an episode in the car while Ms. Judy was driving. Plaintiff began screaming and banging her head off the dash board and threatened to get out of the car while it was still in motion. Ms. Judy had to remind her that her son was in the back seat to persuade her to stay in the car until they got home. (R. 51).

Ms. Judy and one of her daughters have been grabbed and pulled by Plaintiff at times and both have been the subject of her verbal abuse. Plaintiff often starts to perform a task and then stops. She has to be continually reminded to complete tasks. Sometimes when she is reminded to resume a task she will become uncontrollably angry. Plaintiff is extremely tired much of the time such that Ms. Judy and her daughter must step in and assume care of Plaintiff's child. (R. 52-53).

**C. Testimony of Andrew Caparelli.**

Mr. Caparelli, a vocational expert, also testified. The ALJ asked him to assume a person Plaintiff's age with a similar educational background and work experience with the following limitations: the ability to understand, remember, and carry out only simple, one to two step instructions; an inability to engage in more than occasional decision-making and only on simple, work-related decisions; an inability to tolerate more than occasional changes in the work setting; an inability to interact more than occasionally with co-workers and supervisors; and the ability to complete a normal workweek with only occasional interruption from psychologically based symptoms. Based on these assumptions, Mr. Caparelli stated that the hypothetical person would be limited to occupations "with reasoning level of one, and no higher." He stated further that the hypothetical person could

perform such jobs as "institutional cleaner", "machine feeder", and "agricultural produce sorter" and that all three of these positions exist in significant numbers in the national economy. (R. 54-56).

When the ALJ adjusted the hypothetical question to include additional limitations such that the hypothetical person would be off task more than fifteen percent of the workday or miss two days or more of work each month, Mr. Caparelli indicated that a person with those limitations would be unemployable. When the ALJ inquired how much tolerance would be afforded a worker who yells at or physically accosts co-workers or supervisors, Mr. Caparelli stated that there would be "zero tolerance" for such behaviors. (R. 55-56).

### III.  Relevant Medical Evidence.

### A.  Gregory Villarosa, Ph.D.

Dr. Villarosa, a psychologist in North Carolina, saw Plaintiff on referral by the North Carolina Department of Health and Human Services on January 3, 2013. Dr. Villarosa's one session with Plaintiff predated her alleged onset of disability date by almost twenty-one months. Dr. Villarosa assessed that Plaintiff's affect was restricted and her mood mildly dysphoric. Plaintiff denied suicidal ideation and displayed no anxiety-related or psychotic symptoms. Dr. Villarosa had Plaintiff perform the Wechsler Adult Intelligent Scale and determined that her full-scale intelligence quotient was 73, a score indicative of intellect in the low average or worse range. He assessed that Plaintiff had deficits in processing visual-motor information, arithmetic ability, visual problem solving, and reasoning skills. Dr. Villarosa's diagnostic impressions included adjustment disorder with depressed

mood and borderline intellectual functioning. Dr. Villarosa opined that Plaintiff's "current condition may result in some difficulty with work-related activities." He also stated that Plaintiff "might have minimum difficulty dealing with the stress and pressures associated with day-to-day work activity." (R. 1017-1020).

**B. Keystone Behavioral Health.**

On September 2, 2015, Dr. Jagdeep Kaur, a board certified psychiatrist, evaluated Plaintiff on referral from the Pennsylvania Department of Public Welfare. Dr. Kaur assessed primary diagnoses at that time of PTSD, bipolar disorder, and depression along with a secondary diagnosis of psychosis. She indicated that her diagnoses were based on Plaintiff's clinical history and that she had been temporarily disabled since June 8, 2015 and was expected to remain disabled until June 17, 2016. (R. 813-814).

Dr. Kaur subsequently saw Plaintiff on June 28, July 13, September 1, and December 12, 2016. On each of these occasions Dr. Kaur prescribed Zoloft, Depakote, and Seroquel to alleviate Plaintiff's symptoms resulting from PTSD, depression, mood disorder, anxiety, and bipolar disorder. Dr. Kaur consistently assessed that Plaintiff's mood was depressed and anxious, her affect constricted, and her thought content depressive. (R. 907-925).

On September 1, 2016, Dr. Kaur completed a Mental Impairment Questionnaire with respect to Plaintiff. Dr. Kaur opined that Plaintiff had "marked" limitations in terms of her ability to: remember work-like procedures; understand and remember simple instructions; carry out very short and simple instructions; maintain attention for two hour segments; maintain regular attendance and be

punctual within customary tolerances; sustain a routine without special supervision; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; complete a normal workday without interruptions from psychologically based symptoms; and perform at a consistent pace without taking an unreasonable number and length of rest periods. Dr. Kaur explained that these limitations stemmed from Plaintiff's inability to focus and severe anxiety. She also stated that Plaintiff was unable to function independently and could not manage work-related stress. Dr. Kaur estimated that the approximate onset date of Plaintiff's disability was June 20, 2013. (R. 815-818).

### C. Chambersburg Hospital.

In 2013 Plaintiff underwent three psychiatric hospitalizations at Chambersburg Hospital. The first of these was from January 24, 2013 to January 28, 2013. The attending physician, Dr. Satyajit Mukherjee, indicated that the hospitalization was voluntary. Dr. Mukherjee diagnosed "major depressive disorder, severe, single episode without psychotic features" and assessed a global assessment of functioning score ("GAF") of 20 to 30 on admission and 60 on discharge. He stated: "the patient was admitted to the inpatient behavioral health unit … in a setting of depressed mood and self-injurious behavior." She was initially seen in the emergency room due to suicidal ideation and self-mutilation and was admitted after evaluation. (R. 513-523).

On February 7, 2013 Plaintiff again presented to the emergency room at Chambersburg Hospital. At that time she was seen by James W. Freeman, M.D. Dr.

Freeman noted: "This nineteen-year-old just discharged from Behavior Health last week. I think she is on Celexa. Still with fairly marked suicidal ideation." (R. 512).

On July 19, 2013, Plaintiff was once again treated in the emergency room at Chambersburg Hospital. Dr. Mukherjee was once again her attending physician. He noted that she was admitted after overdosing on Celexa and was subsequently admitted to the Behavior Health Unit. He noted also that Plaintiff had been seen by a Dr. Moskel since her previous psychiatric admission in January 2013. Dr. Mukherjee discharged Plaintiff on July 25, 2013 after starting her on Prozac and Trazodone. She was directed to follow up with Dr. Moskel. Dr. Mukherjee's diagnoses on discharge included: "major depressive disorder, moderate severity without psychotic features and mixed personality disorder with features of borderline and histrionic personality disorder." He assessed a GAF score of 20 to 30 on admission and 60 on discharge. (R. 460-469).

### D.  P. Moskel, MD.

Dr. Moskel evaluated Plaintiff for the Pennsylvania Bureau of Disability Determination on January 6, 2014. He noted that Plaintiff had been seeing a psychotherapist several times per month. While Dr. Moskel found Plaintiff to exhibit appropriate speech, a full-range affect, and logical thought process, he also found that her attention and concentration were marginal. Dr. Moskel noted that Plaintiff's insight and judgment "are somewhat superficial and concrete" and that her intelligence "is estimated as low average or somewhere below average." He diagnosed PTSD with psychotic features and a GAF of 50.

Dr. Moskel assessed Plaintiff's ability to understand and carry out simple instructions as impaired to a mild to moderate extent. He found that her ability to understand or carry out complex instructions was markedly impaired due to relatively poor attention and concentration. Dr. Moskel opined that Plaintiff had some marked impairment in terms of getting along with the public, co-workers, and especially supervisors. He concluded that Plaintiff was incapable of managing her own benefits. Her prognosis was described as "quite guarded". Dr. Moskel determined that Plaintiff required intensive psychotherapy and that she would need "a very lengthy course of treatment." (R. 1022-1026).

**E. Action Arbor Review Group.**

A Vocational Report was prepared by the Action Arbor Review Group Medical Review Team at the request of the Pennsylvania Bureau of Disability Determination on December 16, 2015. The report was prepared by Annette Jadus, M.A. and it referenced an evaluation performed by Ronald Refice, Ph.D., a licensed psychologist. Dr, Refice reviewed Plaintiff's medical records through June 8, 2015. From his review of the records, Dr. Refice opined that Plaintiff satisfied the criteria for Social Security Listings of Impairment 12.04 and 12.06. Ms. Jadus wrote:

> Dr. Ronald Refice has found in his review of the documentation
> in this record that Ms. Faith meets the A criteria of both the
> 12.04 and 12.06 Listings. Dr. Refice also finds that she meets
> the B criteria of these listings as well, specifically: marked
> difficulty in maintaining concentration, persistence, and pace,

marked difficulty in maintaining social functioning, and

repeated episodes of decompensation.

The ultimate joint determination of the Action Arbor Review Group was that Plaintiff was "unable to perform any substantial gainful activity." (R. 757-760).

## IV. ALJ Decision.

The ALJ's decision dated June 19, 2017 (R. at 14-27) was unfavorable to the claimant and included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2015.

2. The claimant was not engaged in substantial gainful activity since August 25, 2014, the alleged onset date.

3. The claimant has the following severe impairments: ADD, bipolar disorder, post-traumatic stress disorder, and major depressive disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. part 404, Subpart P, Appx. 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non exertional limitations: the claimant can understand, remember and carry out simple, 1-2 step

instructions, and she can make judgments on simple work-related decisions. She is limited to only occasional decision-making and only occasional changes in the work setting. She is limited to less than occasional interaction or contact with the public and only occasional interaction or contact with co-workers and supervisors in a routing work setting. She would be able to maintain attention and concentration for two-hour segments over an eight-hour period, and the claimant can complete a normal workday and workweek without excessive interruptions from psychologically or physically based symptoms.

6. The claimant has no past relevant work.

7. The claimant was born on September 27, 1993 and was twenty years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8. The claimant has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not an issue because the claimant does not have past relevant work.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the

Social Security Act, from August 25, 2014 through the date of this

decision.

## V. Disability Determination Process.

The Commissioner is required to use a five-step analysis to determine

whether a claimant is disabled.[1]  It is necessary for the Commissioner to ascertain:

1) whether the applicant is engaged in a substantial activity; 2) whether the

applicant is severely impaired; 3) whether the impairment matches or is equal to

the requirements of one of the listed impairments, whereby he qualifies for benefits

without further inquiry; 4) whether the claimant can perform his past work; 5)

whether the claimant's impairment together with his age, education, and past work

experiences preclude him from doing any other sort of work.  20 CFR §§

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or mental impairment
which can be expected to result in death or which has lasted or can be expected to
last for a continuous period of not less than 12 months . . . ."  42 U.S.C. §
423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments
> are of such severity that he is not only unable to do his
> previous work but cannot, considering his age, education,
> and work experience, engage in any other kind of
> substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a specific
> job vacancy exists for him, or whether he would be hired
> if he applied for work.

42 U.S.C. § 423(d)(2)(A).

404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he is unable to engage in his past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R. at 26)

**VI. Standard of Review.**

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence means "more than a mere scintilla". It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The United States Court of Appeals for the Third Circuit further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the

14

> substantiality test if the Secretary ignores, or fails to
> resolve, a conflict created by countervailing evidence.
> Nor is evidence substantial if it is overwhelmed by other
> evidence––particularly certain types of evidence (e.g.,
> that offered by treating physicians)––or if it really
> constitutes not evidence but mere conclusion. *See
> Cotter*, 642 F.2d at 706 ("Substantial evidence" can only
> be considered as supporting evidence in relationship to
> all the other evidence in the record.") (footnote omitted).
> The search for substantial evidence is thus a qualitative
> exercise without which our review of social security
> disability cases ceases to be merely deferential and
> becomes instead a sham.

710 F.2d at 114.

This guidance makes clear that it is necessary for the Secretary to analyze

all evidence. If she has not done so and has not sufficiently explained the weight

given to all probative exhibits, "to say that [the] decision is supported by

substantial evidence approaches an abdication of the court's duty to scrutinize the

record as a whole to determine whether the conclusions reached are rational."

*Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, our Court of

Appeals clarified that the ALJ must not only state the evidence considered which

supports the result but also indicate what evidence was rejected: "Since it is

apparent that the ALJ cannot reject evidence for no reason or the wrong reason,

an explanation from the ALJ of the reason why probative evidence has been

rejected is required so that a reviewing court can determine whether the reasons

for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need

not undertake an exhaustive discussion of all the evidence. *See, e.g., Knepp v.

Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss

in her opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94

F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## VII. Discussion

### A. General Considerations.

At the outset of this Court's review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, I note that the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial; rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

### B. Plaintiff's Allegations of Error.

Plaintiff asserts that the ALJ made two errors that require remand of this case for further consideration. The Court will consider these errors in the order presented by Plaintiff.

**1. Whether the ALJ erred in failing to find that Plaintiff meets the criteria of Listing 12.04 or Listing 12.15?**

Under the Social Security Regulations persons who meet the medical criteria to satisfy designated "Listings" are presumptively disabled and entitled to benefits. Listing 12.04 applies to persons diagnosed with medically documented depressive and bipolar disorders who meet two sets of criteria denominated "A" and "B". The ALJ specifically acknowledged in his decision that Plaintiff suffers from severe impairments including bipolar disorder, major depressive disorder, and PTSD, a condition characterized by severe anxiety. [2] Thus, the question becomes whether the symptomology Plaintiff experiences is severe enough to meet the criteria of the Listing. To qualify for benefits under Listing 12.04 a claimant must demonstrate that he has depressive disorder or bipolar disorder characterized by at least five of nine enumerated impairments. The medical records in this case clearly indicate that Plaintiff has depressed mood, sleep disturbance, decreased energy, difficulty with concentration, and thoughts of suicide. Thus, Plaintiff satisfies the requisite five "A" criteria for disability due to depressive disorder under Listing 12.04.

Listing 12.15 applies to persons with trauma or stress related disorders. The "A" criteria of Listing 12.15, all of which must be present to support an award of disability benefits, are: (1) Exposure to actual or threatened death, serious injury, or violence; (2) Subsequent involuntary experience of flash backs to a traumatic event; (3) Avoidance of external reminders of a traumatic event; (4) Disturbance in mood and behavior stemming from a traumatic event and; (5) Increases in arousal and

---

[2] See www.mayoclinic.org/diseases/post traumatic stress disorder.

reactivity evidenced by exaggerated startle response or sleep disturbance. The medical records in this case clearly indicate that Plaintiff exhibits all five of the Listing 12.15 "A" criteria.

To perfect an entitlement to benefits under either Listing 12.04 or Listing 12.15, a claimant must also satisfy the "B" criteria of each Listing. The "B" criteria for both Listings are identical. Each involves proof that the claimant has an "extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (1) Understand, remember, or apply information; (2) Interact with others; (3) Concentrate, persist or maintain pace; (4) Adapt or manage oneself."

In this case there is medical documentation from Dr. Kaur that Plaintiff's PTSD, bipolar disorder, and depression produce marked limitations in all four of the "B" criteria of Listing 12.04 and Listing 12.15. (R. 815-818). Dr. Refice also found unequivocally that Plaintiff met the "A" and "B" criteria prerequisite to a finding of disability under both Listings. Dr. Moskel concluded that Plaintiff had marked impairment in the ability to interact with others and was incapable of managing her own benefits. While Dr. Moskel did not technically use the phraseology of Listing 12.04, or Listing 12.15, his report (R. 1022-1026) can certainly be read to indicate that Plaintiff satisfies the requisite two areas of marked impairment to establish disability.

Balanced against these medical findings we have the ALJ's naked conclusion: "Because the claimant's mental impairments do not cause at least two 'marked limitations' or one 'extreme' limitation, the 'Paragraph B' criteria are not

satisfied." (R. at 21). The record is devoid of evidence to support the ALJ's conclusion in this regard. [3] Thus, the ALJ's opinion is supported only by his lay interpretation of the notes and findings of three mental health professionals who say otherwise. The ALJ's decision to afford "little weight" to the opinion of Dr. Kaur, a treating physician, is particularly indefensible absent contrary medical evidence. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion." Morales, supra, at 317 (citing *Plummer v. Apfel* 186 F. 3d 422, 429 (3d Cir. 1999)). "The principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability." Morales at 319. The fundamental problem here is that the ALJ alludes to no medical evidence that contradicts the findings of Dr. Kaur and Dr. Refice. Rather, he attempts to undermine their conclusions by pointing to supposed internal contradictions in their notes. These include references without citation to Plaintiff's supposed acknowledgment that her symptoms were manageable without medication, largely

---

[3] The ALJ does afford "partial weight" to the opinion of Dr. Villarosa who saw Plaintiff one time approximately twenty-one months before her alleged onset date. His evaluation actually reinforced the opinions of Doctors Kaur, Moskel and Refice with respect to a "marked" impairment in interacting with others. However, he did find that Plaintiff was only moderately impaired with respect to the ability to understand and carry out simple instructions. Reliance upon Dr. Villarosa's assessment, coming as it did many months before Plaintiff's alleged onset date, is fantastical. It provides no support for the ALJ's assessment of Plaintiff's emotional state during the relevant time period.

normal findings in the treatment records, or "her lack of need for in patient psychiatric hospitalizations." (R. 24-25). Aside from the fact that the record documents that Plaintiff has had three psychiatric hospitalizations, the Court is aware of no regulation or case law that requires that psychiatric hospitalization is a necessary precursor to mental disability and finds that the ALJ's rejection of the findings of Dr. Kaur and Dr. Refice are founded upon precisely the sort of "credibility judgments, speculation, or lay opinion" found inadequate in Morales, supra. Thus, Plaintiff's assignment of error on this point must be credited.

2. **Whether the ALJ's findings that Plaintiff could maintain appropriate interaction with supervisors and co-workers and maintain concentration, persistence, and pace over an eight-workday are supported by substantial evidence?**

The ALJ's residual functional capacity assessment (RFC) at Step Four of the SSA's five-step sequential evaluation process for determining whether an individual is disabled (20 C.F.R. 404.15(a) and 416.920(a)) presumes, inter alia, that Plaintiff can: (1) tolerate occasional interaction or contact with co-workers and supervisors; and      (2) maintain concentration and attention for two-hour segments over an eight-hour period. (R. at 22). These conclusions are contradicted by all physicians who have evaluated Plaintiff's capacity for work during the relevant time period. Drs. Kaur, Moskel, and Refice all concluded that Plaintiff has "marked" impairment in the ability to interact with the public, co-workers, and supervisors. Drs. Kaur and Refice concluded that Plaintiff has "marked" impairment in her ability to maintain concentration, persistence, and pace. While Dr. Moskel did not grade Plaintiff in terms of Listings terminology (i.e. "moderate,

marked, or severe"), he did state that Plaintiff "has relativity poor attention and concentration". (R. 1025-1026).

Similar to the ALJ's evaluation of whether Plaintiff met the criteria of Listing 12.04 or Listing 12.15, there is no contradictory medical evidence in this record to support the ALJ's RFC assessment regarding Plaintiff's ability to interact with others or maintain concentration, persistence, and pace. Thus, the ALJ's hypothetical question to the vocational expert that asked him to assume a person who could tolerate occasional interaction with the public, co-workers, and supervisors and also maintain concentration, persistence, and pace for two-hour segments over an eight-hour period (R. at 54) was fatally flawed because it was not supported by substantial evidence of record. Consequently, the VE's testimony regarding jobs that Plaintiff could supposedly perform is invalidated. A VE's testimony constitutes substantial evidence only if the hypothetical question to which he responds accurately presents all credibly established limitations. *Zirnsak v. Colvin*, 777 F. 3d 607, 614 (3d Cir. 2014); citing *Rutherford v. Barnhart*, 399 F. 3d 546, 554 (3d Cir. 2005). Accordingly, the Plaintiff's assignment of error on this point must be credited as well.

**VIII.  Conclusion.**

For the reasons stated above, this case will be remanded to the Commissioner for reevaluation consistent with points raised in the preceding discussion. The reevaluation should be informed by comment from a consulting/examining psychiatrist. [4] An Order consistent with this determination will be filed contemporaneously.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        March 29, 2019

---

[4] An ALJ has a duty to fully and fairly develop the record. *Ventura v. Shalala*, 55 F. 3d 900, 902 (3d. Cir. 1995). This duty may entail procurement of an additional consultative examination to augment the record. See 20 C.F.R. § 404.1519(a)(b)(4). See also *Robaczewski v. Colvin,* 2015 WL 4930115 at 9 (M. D. Pa. August 18, 2015.)